**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| KARL HAFFENREFFER | : | |
| | : | |
| v. | : | C.A. No. 06-0299-T |
| | : | |
| WILLIAM COLEMAN and | : | |
| JANET COLEMAN | : | |

**PLAINTIFF'S PRE-TRIAL MEMORANDUM**

A. Parties

| | |
|---|---|
| Plaintiff: | Karl Haffenreffer |
| Trial counsel | R. Daniel Prentiss |
| Defendants: | William Coleman<br>Janet Coleman |
| Trial Counsel | |

B. Facts This civil action seeks a declaratory judgment that there is no legal effect to a letter that purports to be a contract that transfers property rights in real estate owned by the estate of Carolyn B. Haffenreffer ("Estate"). The Estate is in probate in the Probate Court of the Town of Little Compton, Rhode Island. The plaintiff, Karl Haffenreffer ("Karl"), is a citizen and resident of the State of Florida and a beneficiary of the Estate. As a person legally interested in the Estate the plaintiff brings this action to recover property in the name of the Estate, pursuant to R.I. Gen. Laws § 33-18-17 and pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201. The amount in controversy exceeds $75,000, exclusive of interest and costs. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, by virtue of the parties' diversity of

citizenship, inasmuch as the defendants, William and Janet Coleman, are citizens and residents of the Commonwealth of Massachusetts.

The letter ("David's Letter") was written to the defendants on November 1, 2002 by Karl's brother, David H. Haffenreffer ("David"), purportedly pursuant to a durable power of attorney granted to David by Mrs. Haffenreffer in 1991. By 2002 Mrs. Haffenreffer was incompetent to manage her affairs. Karl contends that David's Letter is not an enforceable contract because 1) it is without consideration, 2) it was beyond David's authority under the power of attorney, and 3) it is an illusory promise.

A real and substantial controversy exists between the parties regarding the validity of David's Letter as conveying any property right in the real estate owned by the Estate. Unless and until the validity of David's Letter is adjudicated, the Estate will be hindered in its ability to market any parcels of real property, and will receive a sale price that is substantially less than it would receive if the real property could be marketed without the cloud or obligation of the letter's possible burden.

The facts relevant to the creation of David's Letter follow.

Karl and David Haffenreffer's parents, Carl W. Haffenreffer ("Mr. Haffenreffer") and Carolyn B. Haffenreffer ("Mrs. Haffenreffer"), owned a substantial tract of oceanfront and oceanview real estate in Little Compton (sometimes collectively referred to as "Seaconnet Point Farm"), containing several parcels and five dwellings. Some of the parcels were owned solely by Mr. Haffenreffer; the rest were owned jointly by him and his wife. The defendants, Mr. and Mrs. Coleman, rented dwellings from the Haffenreffers every year from 1975 through 2006. Their rentals were year-round, but were occupied only seasonally. The rental amounts they paid were deeply discounted

from market value ($3,150 annual rent in 1975, rising to $17,500 annual rent in 2002, for a two bedroom, oceanfront house, then a five bedroom ocean view house, on a private compound with access to a saltwater swimming pool and three private beaches) until 2003, when the rent was established by professional appraisal at the fair market rental rate.

According to Mr. Coleman, Carl W. Haffenreffer expressed to him on several occasions a desire that if any of his and Mrs. Haffenreffer's parcels on Seaconnet Point Farm were ever to be sold outside the family, the Colemans should be given an opportunity to purchase one of them.[1] In a December 1989 letter Mr. Haffenreffer stated to the Colemans that if they would agree to change their rental from one residence (named "Gunsite") to another (named "Roughhouse"), they would have a "right or option of first refusal should Roughhouse be put on the market as long as Mrs. Haff and/or I own it." In a January 1990 letter he reiterated to the Colemans "that when and if Roughhouse should be on the market outside of intra-family deals, you will be in the on deck circle with first option." The Roughhouse parcel was owned solely by Mr. Haffenreffer.

Mr. Coleman is a graduate of Harvard College and Harvard Business School. He has had an extensive professional career that has included, among many things, serving as chief operating officer of a major real estate development firm.

In 1991, Mrs. Haffenreffer executed the power of attorney designating her husband and her son David as her attorneys-in-fact, with certain specified and limited powers to act in her stead. The power of attorney had two provisions that are pertinent to

---

[1] Mr. Coleman acknowledged in deposition that until just before November 1, 2002, Mr. Haffenreffer was the only Haffenreffer with whom the Colemans had any communications regarding the Seaconnet Point Farm property.

this litigation. First, it authorized her attorney to "sell, transfer and convey, exchange and grant options with respect to any or all of my property ... for such *prices* and upon such terms and conditions, including sales upon credit, as my Attorney may deem best" (emphasis supplied). Second, it authorized her attorney to "make gifts, grants, and other transfers without consideration ... to my spouse and/or to any parent[2] or descendant of mine, and/or to any charitable organization to which I have made gifts in the past ...."

These provisions can be distilled to this proposition: Mrs. Haffenreffer's attorney-in-fact was authorized to make gifts, grants and other transfers without consideration to her descendants; he was also authorized to transfer her property rights to persons other than her descendants, but only for *monetary* consideration.

In 1995, Mr. and Mrs. Haffenreffer executed their final wills. Both wills directed their executors to offer to a neighboring landowner, John Whitehead, the right to purchase portions of Seaconnet Point Farm, if no Haffenreffer family member were to take them, "at the lowest price [the executors] are willing to accept for such property." Their wills made no similar provision for the Colemans. Moreover, the wills devised the Roughhouse parcel to David after the death of the survivor of Mr. and Mrs. Haffenreffer. This provision was first included in their March 1990 codicils to their prior wills, a mere couple of months after Mr. Haffenreffer's second letter to the Colemans.

Mr. Haffenreffer died in 1999. Neither Roughhouse nor any other parcel on Seaconnet Point Farm was placed on the market prior to his death. His entire interest in the Farm was bequeathed under his will to his wife, except for one parcel which was devised to Karl. The Colemans made no claim against Mr. Haffenreffer's estate to assert

---

[2] In 1991 Mrs. Haffenreffer's parents were long deceased.

any right to Roughhouse or to any other Haffenreffer property. The estate was closed in 2001.

In 2002, David took it upon himself to purport to grant the Colemans a formal, written "option to purchase any such parcel or parcels of land … at Seaconnet [Point] Farm" that might be in his mother's estate[3]. After reciting that it was given "for good and valuable consideration exchanged between us, the receipt and sufficiency of which is hereby acknowledged," David's Letter provided in pertinent part:

> In the event of the death of Carolyn B. Haffenreffer, and the subsequent placing on the market for sale of any of the parcels of land, with or without buildings, at Seaconnet [Point] Farm, you are hereby granted an option to purchase a parcel or parcels of land … subject to the following terms and conditions:
>
> a) This Option is secondary to the rights of the extended Haffenreffer family to purchase any such parcel or parcels without regard to this Agreement or the option granted and without the necessity of written permission from you.
>
> b) The Option price, to be paid by you, will be the fair market value of the parcel to be sold, fair market value to be determined by the average of three appraisals by accredited local RE professionals, the cost to be shared equally.
>
> c) This Option is subject to a mutually acceptable Purchase and Sales Agreement being executed between us within thirty (30) days of the date you receive written notice of your opportunity to exercise such option.
>
> d) This Option super[s]edes and nullifies all prior agreements (except for your current lease) between us regarding the real estate at Seaconnet Farm.
>
> e) This Option shall continue until the latter of three (3) months following the final probate of the Estate of Carolyn B. Haffenreffer or for a period of three (3) years from and after the date of death of Carolyn B. Haffenreffer . . . .

In a deposition given in related litigation pending in Newport County Superior Court, David testified that the Colemans paid no price or "monies" for his letter, and that the "good and valuable consideration" to which the letter refers was "having a new owner," who has "been there 35 years who you know and trust and love and all those kinds of things," and who were David's "very good friends." David acknowledged that his letter's pricing mechanism (the average of three appraisals) would probably yield a

---

[3] Argument 2 below demonstrates that this letter is not an option, but a right of first refusal.

lower value to the Estate than if the property were to be sold at open market. Mr. Coleman agreed, stating that there would be a significant difference in price with regard to just one of the five parcels potentially affected by David's Letter: "certainly not ... $100,000. It was more than that."

In a deposition given in the instant case, after he had retained the Colemans' counsel as his own lead counsel in related litigation, David adopted a tactical enhancement of his prior description of what he meant by "consideration" for his Letter:

> The concern was the numerous conversations, the concern was a supposition that there were letters written to them that were delivered over the years that would – they might very well use in some way to be able to complicate the issue of the claim. Yes, that would be a complicated claim upon the estate. This sought to clarify that.

David's recollection of the "numerous conversations" that caused him concern was overheard discussions between his father and the Colemans, in which his father inquired whether the Colemans would ever have an interest in purchasing property if no member of the family should want it, to which the Colemans responded that they would be interested. David's professed "concern" and "supposition that there were letters written them" are artifacts of discovery in this case; he testified that he only became aware of Mr. Haffenreffer's letters to the Colemans two days before giving his deposition testimony.

Mrs. Haffenreffer died on December 13, 2003. Her Estate presently owns five parcels of property whose date-of-death appraisals total $6,315,500.

On May 17, 2006, pursuant to R.I. Gen. Laws § 33-18-17, Karl served his fellow executors ("Executors"), David H. Haffenreffer and Noel. M. Field, Jr., with a request that they commence a proceeding to recover the property represented by David's Letter.

They failed to do so within the fifteen (15) day period provided by the statute, nor have they done so since. Karl then filed this civil action pursuant to the statute.

C. Claims The plaintiff claims that David's Letter is invalid and unenforceable because 1) it is without consideration, 2) it was beyond David's authority under the power of attorney, and 3) it is an illusory promise. The Colemans acknowledge that they gave no monetary consideration, but assert that the doctrine of promissory estoppel would "fill any alleged gap in consideration" for David's Letter.

D. Damages The plaintiff has no claim for damages.

E. Issues

1. Is David's Letter supported by consideration?

2. Did the communications between Carl W. Haffenreffer and the Colemans give rise to a contract regarding Haffenreffer property in Little Compton?

3. Even assuming Carl W. Haffenreffer's communications resulted in a contract, would such a contract survive the deaths of Carl W. and Carolyn B. Haffenreffer?

4. Is David's Letter, which had neither a price nor any other form of consideration, beyond the authority granted to David by the Power of Attorney?

5. Is David's Letter unenforceable in any event because it is an illusory promise?

6. Can the Colemans establish estoppel based on detrimental reliance?

The plaintiff proposes that issues 2 through 5 involve no disputed issues of fact, and can be determined by the Court as a matter of law. The only factual dispute to be resolved with respect to issue 1 is whether the Colemans had, in November 2002, a reasonable belief, based on uncertainty in the facts and/or law, that they had an enforceable right with respect to a parcel of Haffenreffer property. The factual dispute in issue 6 is whether the Colemans were intentionally induced by Carl W. Haffenreffer to

take action that was prejudicial to them. Because estoppel is an equitable doctrine, this fact issue is to be resolved by the Court.

F. Argument

1. DAVID'S LETTER IS UNSUPPORTED BY CONSIDERATION.

The Colemans admit that the consideration for David's Letter was "not monetary consideration"; nevertheless they assert that there was consideration in the form of "a 'value for value' exchange whereby Carolyn Haffenreffer got the benefit of a 'clarified,' limited option rather than the more open ended 'gentlemen's agreement' that had existed for so many years." Answer of William and Janet Coleman to Interrogatory No. 3.[4]

So stated, the Colemans have failed to describe legal consideration. In order to support a contract, there must be consideration consisting of "some legal right acquired by the promisor in consideration of his promise, or forborne by the promisee in consideration of such promise." *DeAngelis v. DeAngelis*, 923 A.2d 1274, 1279 (R.I. 2007) (quoting *Darcey v. Darcey*, 29 R.I. 384, 71 A. 595 (1909), internal quotation marks omitted). The "benefit" of "clarification" of a "gentlemen's agreement" is not a legal right or interest that can be the subject of consideration. A "gentlemen's agreement" is commonly and correctly understood to mean "an agreement which is not enforceable at law". *The Oxford English Dictionary*, 2nd edn., at "gentleman", 7.c. If what the Colemans intend is that they agreed to forbear from making a claim against Mrs. Haffenreffer's Estate after her death in exchange for David's Letter, they fail to establish

[4] The answer's full discussion of consideration reads: "The consideration was not monetary consideration. Rather, it was a value for value exchange whereby Carolyn Haffenreffer got the benefit of a clarified, limited option rather than the more open ended gentlemen's agreement option that had existed for so many years. The extent and scope of her legal liability to us in connection with that historic option (and the concomitant uncertainty that could have resulted from its future enforcement) were, of course, uncertain, and there was value to having the rights and obligations of the parties clarified once and for all." The answer continues with an assertion of detrimental reliance.

legal consideration that would support a contract. Further, David's Letter not only purports to formalize in writing what was oral and/or informal: it creates for the first time a price mechanism; it significantly expands the scope of the property involved; and it extends the time for the Colemans to act, beyond the death of Mrs. Haffenreffer and even beyond the final probate of her will – all three elements being to the benefit of the Colemans and to the detriment of the Estate, with not one element added or subtracted that benefits the Estate. Whereas Mr. Haffenreffer, by all accounts, never contemplated the Colemans purchasing more than one parcel during his and Mrs. Haffenreffer's lifetimes, David's Letter purports to grant them the right to purchase "a parcel or parcels of land" after Mrs. Haffenreffer's death.

To constitute consideration, the Colemans' forbearance must be of a "legal right." *DeAngelis, supra.* While the Colemans are not required to establish conclusively the legal validity of their forborne claim, that claim must be shown to have substance in law and in evidence in order for its forbearance to constitute valid consideration. *Holt v. Holt*, 282 S.E.2d 784, 789 (N.C. 1981) ("It goes without saying, however, that *there must be some reasonable or substantial basis for the claims advanced by the parties which are surrendered by the agreement*") (internal quotation omitted; emphasis in original); *Agristor Credit Corp. v. Unruh*, 571 P.2d 1220, 1223 (Okla. 1977) ("the forbearance of a right cannot constitute the consideration for the making of a contract unless the forbearing party has a reasonable belief that he or she has, at least, a questionable right to act rather than forbear"); *Dick v. Dick*, 355 A.2d 110, 118 (Ct. 1974) (same); Lord, *Williston on Contracts*, § 7:45; Restatement (Second) of Contracts, § 74 (1981) ("Forbearance to assert or the surrender of a claim or defense which proves to be invalid

is not consideration unless (a) the claim or defense is in fact doubtful because of uncertainty as to the facts or the law, or (b) the forbearing or surrendering party believes that the claim or defense may be fairly determined to be valid"). *See Lapan v. Lapan*, 100 R.I. 498, 217 A.2d 242, 245 (1966) (forborne claim would not be consideration if "either obviously absurd in fact or unfounded in law" (dictum)).

The Colemans' forbearance of a claim against the Estate of Carolyn B. Haffenreffer would constitute consideration only to the extent that the claim forborne was "doubtful," based on uncertainty as to the facts and/or the law. The only possible source for such a claim is the so-called "gentlemen's agreement," which the Colemans defined in deposition testimony as the term applicable to the overall communications between them and Carl W. Haffenreffer, including his two letters. It will be shown in arguments 2 and 3 below that these communications provided the Colemans with no basis for any belief that they had a claim against any Haffenreffer relating to the Little Compton property. There was no contract formed by Mr. Haffenreffer's letters or oral communications. The Colemans had no legal right or interest in any Haffenreffer property, and, even for someone less experienced in real estate transactions than Mr. Coleman, no reasonable basis for a belief that they did. The relinquishment of such a gossamer claim cannot be consideration for a contract.

David's Letter is further invalidated by the absence of any bargained-for exchange of the purported consideration. David offered the letter to his "very good friends" based on his desire to "hav[e] a new owner who has been there 35 years who you know and trust and love and all those kinds of things."

The Rhode Island Supreme Court imposes a requirement that consideration be in fact negotiated to be valid as supporting the existence of a contract. "In determining whether there was sufficient consideration for a binding contract to have been formed, we employ the bargained-for exchange test; that test provides that something is bargained for, and therefore constitutes consideration, 'if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.'" *DeAngelis v. DeAngelis*, *supra,* 923 A.2d at 1279, quoting *Filippi v. Filippi*, 818 A.2d 608, 624 (R.I. 2003). Restatement (Second) of Contracts, §71 (1981): ("(1) To constitute consideration, a performance or a return promise must be bargained for. (2) A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise").

The evidence demonstrates that there was no such bargain and exchange leading to David's Letter. On the contrary, David testified that the letter was his idea, intended to give the Colemans "something more than any communication and intent and letters from my parents to give them a leg up on being able to stay at Seaconnet Point Farm after my parents died." That is, David's discussions with the Colemans had nothing to do with removal of any potential claim based on his parents' (clearly non-binding) communications with the Colemans, but rather were to put in place a binding and effective right where none existed before. David prepared his letter and submitted it to the Colemans. The only change they requested, and the only bargaining that took place in the letter's creation, was to insert the language setting the purchase price through the use of three appraisers. David agreed, and the Colemans countersigned and returned the document. There was no exchange by which the Colemans asserted any right to the

Haffenreffer property under the "gentlemen's agreement" and then consented to relinquish such a right if they were granted some other rights in the property. The Colemans' alleged forbearance was neither established nor bargained for and cannot constitute consideration.

2. THE COMMUNICATIONS BETWEEN CARL W. HAFFENREFFER AND THE COLEMANS DID NOT FORM A CONTRACT.

The oral and written communications between Carl W. Haffenreffer and the Colemans differ not only in medium but in message. The oral conversations were expressions of a mutual desire that the Colemans would some day acquire one parcel of Haffenreffer property and reside there. The discussions were platitudinous and ultimately abstract. Mr. Haffenreffer never discussed the indispensable element of price, or even a mechanism for setting a price. Such conversations provide none of the elements of a contract. There was no exchange of promises and obligations. As oral conversations, they would be unenforceable in any event under the statute of frauds. R.I. Gen. Laws § 9-1-4 (1) (contract for sale of real property required to be in writing).

The letters, on the other hand, specified one particular parcel (Roughhouse), recited consideration ("if you agree to occupy Roughhouse – in lieu of Gunsite") and provided some definition of the nature of the transaction that was contemplated: namely, if the Roughhouse parcel were ever to be marketed outside the family as long as Mr. and/or Mrs. Haffenreffer owned it, the Colemans would be first in line to buy it.

Although both of Mr. Haffenreffer's letters use the term "option," they clearly do not constitute an option to purchase real estate.[5] Rather, the intended relationship is akin

[5] *See Haydon v. Stamas*, 900 A.2d 1104, 1111 (R.I. 2006), defining option as agreement in which optionee obtains "the exclusive right, but not the obligation, to purchase…," and prohibits optionor from selling to

to a "right of first refusal", a term also used in his first letter. A right of first refusal is defined as an "independent privilege," which "does not become effective unless the [sellers] are willing to sell. If they are willing to sell they may not sell to anyone other than the [holders of the right] until an opportunity is afforded [holders] to purchase at the price offered." *Hood v. Hawkins*, 478 A.2d 181, 185 (R.I. 1984), quoting *Butler v. Richardson*, 74 R.I. 344, 60 A.2d 718 (1948).

To be enforceable, a grant of a right of first refusal "must be specific in regard to the price and other considerations of the sale or provide a means by which the conditions of the sale, including the price, can be ascertained with certainty." *Doyle v. McNulty*, 478 A.2d. 577, 579 (R.I. 1984); *Hood v. Hawkins*, *supra* 478 A.2d at 186 ("the grantor's intent must be clear and either the price and the conditions of sale must be fixed, or there must be a means for subsequently ascertaining them"). A purported right of first refusal that fails to provide definition of price, or a mechanism for determining price, is invalid and unenforceable. *Id.*

Carl W. Haffenreffer's letters do not mention price or a mechanism or formula for determining price, or any other terms and conditions required to form a contract for the sale of real property. His offer to the Colemans is merely a vague right to purchase Roughhouse if either he or Mrs. Haffenreffer, as owners, were to offer it for sale outside the family. The letters leave the initiative to the seller, which distinguishes a right of first refusal from an option. The letters leave the price to be paid within the seller's unfettered discretion, and thus are unenforceable as granting any right in Roughhouse (or in any other parcel of Haffenreffer property).

another buyer, during term of option; *Hood v. Hawkins*, 478 A.2d 181 (R.I. 1984) (distinguishing between option and right of first refusal).

The "gentlemen's agreement" provided the Colemans with no property right in any Haffenreffer property. The Colemans had nothing to forbear in exchange for a grant of rights in 2002.

### 3. EVEN IF CARL W. HAFFENREFFER HAD FORMED A CONTRACT WITH THE COLEMANS, SUCH A CONTRACT WOULD NOT HAVE SURVIVED THE DEATHS OF MR. AND MRS. HAFFENREFFER.

While it is an academic point, given the lack of any legal effect to the communications between Mr. Haffenreffer and the Colemans, it is worth noting that even if those communications had achieved the status of a contract, it would have expired on the deaths of both Mr. and Mrs. Haffenreffer.

Mr. Haffenreffer's letters dealt only with the parcel known as Roughhouse, which he owned solely. Mr. Haffenreffer died in 1999; his will left Roughhouse to his wife. If he had effectively burdened Roughhouse with a contract in favor of the Colemans, such a contract might be argued to have survived his death and continued to burden the property after passing to his wife. But since his first letter stated that "the right or option of first refusal" would exist only "as long as Mrs. Haff and/or I own it," any such contract would not have survived Mrs. Haffenreffer's death.

Whether the parties to the "contract" intended it to extend to the Haffenreffers' heirs is a question to be determined in the same manner as any other instance of contract interpretation, which is a question of law for the court in the first instance. *Haydon v. Stamas, supra,* 900 A.2d at 1110. The Court must view the "contract in its entirety, assigning to its terms their plain and ordinary meanings as the manifestation of the parties' intent." *Id.* In situations where "the contract terms are clear and unambiguous, judicial construction is at an end[,] for the terms will be applied as written." *Id.*

Here, the words of the "contract" could not be clearer. The promise was stated by Mr. Haffenreffer to remain in effect as long as he and/or his wife owned Roughhouse. There is nothing in his words to suggest that he intended his promise to bind his wife's estate. The words "as long as Mrs. Haff and/or I own it" do not imply that his promise would have a life longer than their own. On the contrary, the words of his letter can only be construed as making a promise explicitly intended to expire on the death of the survivor of Mr. and Mrs. Haffenreffer.

While the Rhode Island Supreme Court has not addressed this issue, other jurisdictions have reached the result described above. *See Brauer v. Hobbs,* 391 N.W.2d 482 (Mich. App. 1986) (there is a strong tendency to construe an option or pre-emption to be limited to the lives of the parties, unless clear evidence of contrary intent; finding agreement terminated at death because it required the volitional act of offering property for sale); *Ensor v. Wehland*, 221 A.2 699 (Md. 1966) (right of first refusal limited to life of grantor when based upon her intention to sell, and words "heirs, personal representatives and assigns" not employed); *Mercer v. Lemmens*, 230 Cal. App. 2d 167, 172 (1964) (death of seller prior to decision to sell property extinguishes pre-emptive right of first refusal (dictum)).

Even if the words "as long as Mrs. Haff and/or I own it" were somehow to be construed as ambiguous, the Court would ultimately reach the same result. An ambiguity in a contract can be resolved through the consideration of extrinsic evidence. *McBurney v. Teixeira*, 875 A.2d 439, 443 (R.I. 2005). Here, that evidence shows that shortly following the January 1990 letter, Mr. and Mrs. Haffenreffer executed codicils to their then-current wills, the provisions of which were incorporated into their final, 1995 wills.

By their testamentary instruments the Haffenreffers demonstrated their knowledge of providing for post-mortem rights of first refusal, in granting one to Mr. Whitehead. That they made no similar provision for the Colemans must be taken as intentional: the Haffenreffers did not intend to grant the Colemans any rights in their property following their deaths.

This intention is driven home in the Haffenreffers' treatment of Roughhouse in their March 1990 codicils and again in their final, 1995 wills. In devising Roughouse to David (the property was conveyed to him after his mother's death), his parents clearly manifested their intention that any understanding they had reached with the Colemans regarding Roughhouse was to terminate upon the death of the survivor of them.

Therefore, either through construction of Mr. Haffenreffer's letters by their terms, or by consideration of extrinsic evidence, the conclusion is inescapable that even if his letters had granted any right with respect to Roughhouse, that right expired on the death of the survivor of Mr. and Mrs. Haffenreffer. In November 2002, when David created his letter, which by its terms could not be exercised until after his mother's death, he had his mother's sole authority with respect to the disposition of Roughhouse. If the Colemans had possessed an enforceable right of first refusal with respect to Roughhouse, that right was contingent on David's offering the parcel, as his mother's attorney in fact, for sale outside the family. Given the fact that the parcel, as David knew, was devised to him in his mother's will, there was no chance of such an offer. Nor had the Colemans any colorable claim with respect to any other Haffenreffer property in November 2002 that could be relinquished or forborne as consideration for the grant of a new right in David's Letter.

4. DAVID'S LETTER EXCEEDED HIS AUTHORITY UNDER MRS. HAFFENREFFER'S POWER OF ATTORNEY.

The power of attorney under which David purported to act in issuing his letter limited his authority in the disposition of Mrs. Haffenreffer's property. His power to transfer interests in property was strictly circumscribed. To "descendants" of Mrs. Haffenreffer and to charities to which she had previously bestowed gifts David could convey property "without consideration" of any kind . By contrast, his authorization to transfer property rights to persons other than Mrs. Haffenreffer's descendants required that such transfers be in consideration of "such *prices* and upon such terms and conditions, including sales upon credit, as my Attorney may deem best" (emphasis supplied). While the power of attorney lets the attorney set the *amount* of the price,[6] it still requires a price in some amount, to be paid in cash or "upon credit." Together, the two provisions can only be construed to mean that David was powerless to transfer Mrs. Haffenreffer's property rights to persons other than her descendants without a price, whose plain, ordinary, primary sense is *monetary* consideration.

Neither of the Colemans is a descendant of Mrs. Haffenreffer. The Colemans and David have acknowledged that the Colemans paid no price for David's Letter.

Powers of attorney are construed according to familiar tenets. "The rules which govern the construction of instruments designating an attorney in fact are well settled. The primary object of such construction is to ascertain the intention with which the grant of powers was conferred and to give effect thereto. * * * In the ascertainment of that intent the instrument is to be construed as a whole ... and in light of the circumstances

[6] Subject, of course, to his obligations as a fiduciary to set the price in the best interest of his principal, and with scrupulous avoidance of any consideration of his own interests that may conflict with his principal's interest.

that existed at the time of the making thereof. * * * Further and most important in the instant case, *these instruments are to be construed strictly and are not to be enlarged by construction. *** And there is authority that such instruments are to be construed restrictively.*" *Ricci v. Capelluzzi*, 90 R.I. 171, 156 A.2d 207, 209 (1959) (internal citations omitted; emphasis supplied). *See* 3 Am. Jur. 2d, *Agency*, § 28 (2007) ("Generally, a power of attorney must be strictly construed").

By its terms and under the applicable rules of construction the power of attorney under which David purported to act forbade him from conveying an interest in Mrs. Haffenreffer's property to the Colemans without monetary consideration. Yet, as demonstrated here and in argument number 1 above, David demanded and received from the Colemans no consideration of any sort. David's Letter was therefore beyond the scope of his authority under Mrs. Haffenreffer's power of attorney.

5. DAVID'S LETTER IS UNENFORCEABLE BECAUSE IT IS AN ILLUSORY PROMISE.

David's Letter purports to grant "an option". Rather, like Mr. Haffenreffer's letters, what it purports to grant is actually a right of first refusal in any and all parcels of land that the Executors of Mrs. Haffenreffer's Estate might place on the market for sale (outside of sales to family members). Fairly read, its application would commence when the Executors notified the Colemans of their intention to offer one or more parcels for sale outside the family. On such notification, the Colemans could exercise their right of first refusal under David's Letter by undertaking to negotiate a purchase and sale agreement, with the price for the purchase to be the average of three appraisals of the subject property. However, consummation of the purchase and sale under David's Letter was expressly "subject to a mutually acceptable Purchase and Sales Agreement being

executed between us within thirty (30) days of the date you receive written notice of your opportunity to exercise such option."

The inclusion of this language in David's Letter renders it unenforceable, because it provides either party with the power to nullify the agreement by simply failing to come to consensus on an acceptable purchase and sale agreement. Arriving at consensus on a final agreement is within the unilateral control of either party. This renders the agreement unenforceable because of a want of mutuality of obligation.

The Rhode Island Supreme Court reached exactly this conclusion in the case of a real estate purchase transaction that contained an essentially identical term regarding negotiation of a purchase and sale agreement. *Centerville Builders, Inc. v. Wynne*, 683 A.2d 1340 (R.I. 1996). There, the parties signed an offer to purchase real estate that included the provision, "subject to satisfactory purchase & sale agreement between seller and buyer." *Id.* The agreement set forth the sale price, was accompanied by a deposit, and provided for a total deposit of five percent on execution of the purchase and sale agreement.

The court held the agreement to be unenforceable because of the inclusion of the language making it contingent on the execution of a "satisfactory" purchase and sale agreement. The court noted that this provision reserved to either party "the unfettered discretion to thwart the purchase and sale by unilaterally invoking condition 6 of the offer-to-purchase agreement and rejecting any purchase-and-sale agreement as 'unsatisfactory.'" *Id.*, 683 A.2d at 1341. The agreement was therefore unenforceable because fulfillment of the condition of execution of a purchase and sale agreement "depended solely on the subjective will of either party." *Id.*

The Rhode Island Supreme Court's decision in *Centerville Builders* was distinguished by the First Circuit in *Bacou Dalloz USA, Inc. v. Continental Polymers, Inc.*, 344 F.3d 22 (1st Cir. 2003). In that case, the parties signed an agreement that contemplated the execution of a further, more elaborated contract for the supply of certain raw materials. The First Circuit held that *Centerville Builders* did not render the preliminary agreement unenforceable because it did not contain language requiring that the future supply contract be "satisfactory" to either party, and because the executed agreement contained all of the material terms that were to be contained in the future supply contract. 344 F.3d at 27. On that basis, the court held *Centerville Builders* to be inapplicable, and the initial agreement to be an enforceable agreement to enter into a supply contract.

The features that distinguished the agreement in *Bacou Dalloz* from the one in *Centerville Builders* do not exist in David's Letter. First, David's Letter contains the same kind of language requiring mutual satisfaction regarding the contemplated agreement that the courts in both *Centerville Builders* and *Bacou Dalloz* found to be dispositive. Second, it cannot be said that David's Letter contains all of the material terms that would be included in a purchase and sale agreement. The property to which David's Letter is potentially applicable consists of five parcels of oceanfront or oceanview land, contiguous to the three parcels that David acquired from the Estate. Issues that can be contemplated as being pertinent to a purchase and sale agreement for such parcels include financing contingencies, surveys, inspections, rights over contiguous properties, and restrictive covenants regarding use, building, development and resale. There is nothing in David's Letter that would provide even guidance, much less

definition of obligations, on such terms. If the Colemans decided that the price set by the appraisal process was one that they could not or would not pay, they could avoid their obligation to purchase by insisting on including certain beach or other rights in the conveyance. The Estate, by the same token, could frustrate consummation of the purchase by including, for example, restrictions on the development of a parcel to prevent any structure that would be visible from the Haffenreffer homes. In either event, buyer and seller retain the ability to scuttle a deal in the negotiation process of an "acceptable" purchase and sale agreement.

David's Letter is governed by *Centerville Builders*. As an illusory promise it is unenforceable.

6. THE COLEMANS ACQUIRED NO RIGHTS IN ESTATE PROPERTY THROUGH ESTOPPEL.

In the defendants' statement of claims and defenses and in discovery responses the Colemans assert that they have established rights in Estate property through estoppel, based on their detrimental reliance on the so-called "gentlemen's agreement." The conduct they describe as constituting their detrimental reliance is the payment of rent for use of Haffenreffer dwellings for their summer residence and their failure to purchase real estate elsewhere in Little Compton. These facts will not support a claim for estoppel through detrimental reliance.

The Rhode Island Supreme Court has clearly enunciated the standards that are to be applied in determining the validity of a claim of estoppel. Those standards are fatal to the Colemans' claim. "In order to argue a claim of estoppel successfully, plaintiff must show that defendant, by some affirmative conduct or representation, intentionally induced the plaintiff to act or fail to act in detrimental reliance on that conduct or representation."

*Martinelli v. Travelers Insurance Companies*, 687 A.2d 443, 447 (R.I. 1996). "The key element of an estoppel is *intentionally induced prejudicial reliance*." *East Greenwich Yacht Club v. Coastal Resources Management Council*, 118 R.I. 559, 376 A.2d 682, 686 (1976) (emphasis supplied); *Raymond v. B.I.F. Industries*, 112 R.I. 192, 308 A.2d 820 (1973).

The Colemans can establish neither that Mr. Haffenreffer intentionally induced them to take or refrain from any action, nor that their action or inaction constituted a detriment. First, there is no evidence whatsoever that anything other than generosity and friendship motivated Mr. Haffenreffer's communications with the Colemans about possibly buying Roughhouse if the Haffenreffers were to sell it. The facts could not support an inference that he acted with an intention to induce the Colemans to do or not do anything, much less to engage in conduct that was detrimental to their interests.

More importantly, the Colemans cannot possibly establish that they were harmed or prejudiced in any way by their continued tenancy at Seaconnet Point Farm. They openly acknowledge that they paid rents that were far below market for occupancy of some of the most choice ocean front real estate in the state. During several years they reduced their cost even further by subletting their rented residence at rates far in excess of what they were paying. Although in answer to discovery the Colemans asserted that they lost the opportunity to purchase real estate elsewhere in Little Compton because of their continued rental of Haffenreffer residences, they testified at deposition that in fact the rental payments they made were not in an amount that would have been material to a decision to acquire Little Compton realty. Indeed, they made such a purchase in 2003, after the rent on the Haffenreffer property had been adjusted to fair market value.

The Colemans cannot support the fundamental element of a claim of detrimental reliance, which is detriment. On the contrary, they have benefited magnificently from Haffenreffer family generosity over the past thirty years. They have no claim of rights in Haffenreffer property by estoppel.

G. Proposed Voir Dire Questions

1. Does any member of the panel have any acquaintance or familiarity with any of the following persons:

   Karl Haffenreffer

   William Coleman

   Janet Coleman

   David H. Haffenreffer

   Any other member of the Haffenreffer family

2. Did any member of the panel have any acquaintance, familiarity, or knowledge concerning the late Carl W. Haffenreffer, who died in 1999, and Carolyn B. Haffenreffer, who died in 2003?

3. Has any member of the panel ever been involved in a lawsuit of any kind?

4. Has any member of the panel ever been involved in a lawsuit that has involved family members?

5. Does any member of the panel have any particular feelings about lawsuits that involve family members being in dispute with each other?

6. Can the members of the panel accept that the facts of this case are to be judged without regard to the fact that it involves family members?

7. Can the panel members accept that they are to draw no conclusions, and make no judgments, regarding parties to this case, or the facts of the case, merely on account of two family members being involved in this dispute?

8. Has any member of the panel ever been involved in a dispute regarding an alleged agreement for the purchase and sale of property?

9. Has any member of the panel had any training, education, or experience in the field of business contracts or business law?

10. Has any member of the panel any familiarity with an organization known as Conservation Law Foundation?

Respectfully submitted,

KARL HAFFENREFFER

By his attorneys

**R. DANIEL PRENTISS, P.C.**

/s/R. Daniel Prentiss
R. Daniel Prentiss (#0783)
One Turks Head Place, Suite 380
Providence, RI 02903
Tel: 401-824-5150
Fax: 401-824-5181
dan@prentisslaw.com

**CERTIFICATION**

I hereby certify that on this 30th day of November, 2007, this document was filed electronically and is available for reviewing and downloading to the ECF registered counsel of record.

William R. Landry, Esq.
Blish & Cavanagh LLP
30 Exchange Terrace
Providence, RI 02903

/s/R. Daniel Prentiss